## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABF Freight System Inc.
    8401 McClure Drive
    Fort Smith, AR 71916;

                 Plaintiff,

   v.

BNSF RAILWAY COMPANY
    2650 Lou Menk Drive
    Fort Worth, TX 76131;

CSX TRANSPORTATION, INC.
    500 Water Street
    Jacksonville, FL 33202;

NORFOLK SOUTHERN RAILWAY COMPANY
    Three Commercial Place
    Norfolk, VA 23510; and

UNION PACIFIC RAILROAD COMPANY
    1400 Douglas Street
    Omaha, NE 68179,

                Defendants.

Civil Action No. _____

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

ABF Freight System Inc. ("Plaintiff") brings this action for damages under the antitrust laws of the United States against BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") (collectively, "Defendants").

### I.      NATURE OF THE ACTION

1.      This is an antitrust case. Defendants are the four largest United States-based "Class I" railroads. Plaintiff is a leading national less-than-truckload freight carrier. Plaintiff alleges that

Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      Plaintiff purchased unregulated rail freight transportation services from one or more of the Defendants from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and was assessed a rail fuel surcharge by one or more of the Defendants for the agreed-upon transportation. The term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

3.      Defendants conspired for years to fix, raise, maintain, and/or stabilize prices of rail freight transportation by agreeing to impose jointly uniform fuel surcharges. A fuel surcharge is a separate fee above and beyond the base rate for transportation and is purportedly to compensate for increases in the cost of fuel. As explained herein, the term "fuel surcharge" was a misnomer because the rates were calculated as a percentage of base shipping rates and were unrelated to the actual fuel charges incurred by Defendants.

4.      Defendants engaged in the conspiracy for the purpose of generating billions of dollars of additional revenue for themselves. In a proceeding captioned *Rail Fuel Surcharges*, Ex Parte No. 662 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency that succeeded the Interstate Commerce Commission ("ICC") as the agency charged with regulating aspects of the railroad industry, found the Defendants' uniform practice of computing rail fuel surcharges as a percentage of base rail freight rate was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."

5.      Defendants' conspiracy was the subject of class action litigation. *See*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight I*), 292 F. Supp. 3d 14 (D.D.C. 2017). The court noted that the "documentary evidence is strong evidence of conspiracy and class-wide

injury," *id.* at 32, and that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial," *id.* at 102. The court also specifically found that there is "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

6.   Defendants maintained their conspiracy during the Relevant Period by uniformly computing fuel surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their fuel surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

7.   As the district court overseeing the class action noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight I*, 292 F. Supp. 3d at 104. These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

8.   Plaintiff spent millions of dollars shipping materials on Defendants' rail lines during the Relevant Period and, consequently, was injured by the anticompetitive conduct when it paid overcharges to one or more of the Defendants. Plaintiff seeks damages for fuel surcharges

imposed on carload rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.

## II.   PARTIES

9.     Plaintiff ABF Freight System Inc. is a corporation organized under the laws of the State of Arkansas, with its principal place of business in Fort Smith, Arkansas. During the Relevant Period, Plaintiff purchased unregulated freight transportation directly from one or more of the Defendants. Plaintiff was injured in its business and property when it paid higher prices for unregulated rail freight transportation services than it would have paid absent Defendants' alleged conspiracy.

10.     Defendant CSX has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

11.     Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS connects with rail partners in the West and around the world and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

12.     Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is the second largest railroad in North America, operating primarily in the western United States. BNSF maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

13.     Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States, operating primarily in the western United States. UP maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

### III.     JURISDICTION AND VENUE

14.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.     Jurisdiction is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391 because during the Relevant Period, one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

17.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

### IV.     INTERSTATE TRADE AND COMMERCE

18.     During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The Association of American Railroads Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

19.     Defendants' activities were within the flow of, and substantially affected, interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

20.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

### V.     FACTUAL ALLEGATIONS

**A.     The Railroad Industry Experienced Deregulation and Increasing Concentration in the Years Leading Up to the Alleged Conspiracy.**

21.     Congress dramatically changed regulation of the U.S. railroads with introduction of the Staggers Rail Act of 1980 ("Staggers Act"). This ended an era of regulatory control over nearly all aspects of railroad economic operations and allowed the railroad industry to independently set market rates for rail transportation.

22.     Prior to the Staggers Act, freight railroads typically charged only published tariff rates that the railroads filed with the ICC, the predecessor to the STB. Railroads accordingly could apply to the ICC for across-the-board rate increases, which could then be implemented lawfully on a collective basis.

23.     Today, the vast majority—i.e., 80% or more—of all rail shipments take place under private transportation contracts, which are not rate-regulated. The railroads can no longer turn to any government agency to implement across-the-board rate increases in freight rates, and it is unlawful for the railroads to collusively fix rates.

24.     Additionally, the railroad industry has become highly concentrated. Since 1980, the number of Class I railroads declined from 35 in 1980 to just seven today—two of which are owned

by Canadian entities. Defendants dominate this industry, operating more than 90% of all railroad track in the United States and bringing in close to $50 billion in annual revenue. Given the high fixed costs and significant barriers to entry in the railroad industry (e.g., required investments in a vast network of stations, tracks, yards, and switching facilities, which can take decades to develop and involve burdensome regulatory and environmental reviews and approval), there is only a fringe of smaller, niche carriers offering Defendants negligible competition.

25.     Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates, but this combination of a highly concentrated market and high barriers to entry for new competitors provided Defendants with an environment conducive to anticompetitive conduct and collusive pricing.

**B.     Defendants Unsuccessfully Attempted to Raise Rates Prior to the Relevant Period.**

26.     By the early 2000s, the railroad industry had reached such high levels of concentration that further mergers were essentially impossible. Indeed, in response to a proposed merger of BNSF and Canadian National Railway Co., the STB imposed a moratorium on new mergers and then promulgated stricter standards for merger review.

27.     Without the ability to consolidate further or to petition for rate increases (as Defendants did in the ICC days), Defendants lacked the means to easily and lawfully implement across-the-board rate increases. Indeed, the introduction of greater competition through deregulation of the rail industry meant that Defendants could not unilaterally raise prices, through using fuel surcharges or otherwise. As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *See Rail Freight I*, 292 F. Supp. 3d. at 103. In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck

Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

28.     When Defendants did apply stand-alone, rate-based fuel surcharges, such surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight II*"). These fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Relevant Period. *Id.* at 48.

29.     For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* Similarly, the CFO of UP testified that during 2000 through 2002, UP did not have a company-wide policy on fuel surcharges and that "[t]here were some isolated situations where there were surcharges, but . . . no policy position." *Id.* A BNSF executive testified that fuel surcharge participation rates in January 2003 were "low," *id.*, and CSX executives similarly testified that, prior to the Relevant Period, fuel surcharges were "low" and "fairly minimal" among its customers. *Id.*

30.     Another challenge to Defendants' ability to implement new fuel surcharges as a means to raise rates was that there was already a mechanism that allowed railroads to recoup for rising fuel costs. The private freight transportation contracts that came into use after the Staggers Act included cost escalation provisions typically tied to the All-Inclusive Index ("AII") and Rail Car Adjustment Factor ("RCAF"), published by the Association of American Railroads ("AAR"). The AII and RCAF already permitted full recovery by the railroads of actual fuel cost increases, no matter how large. As discussed in more detail below, Defendants conspired to change these

cost escalation provisions to remove the fuel component in furtherance of the ultimate conspiracy to impose supracompetitive fuel surcharges.

31.     In short, before the Relevant Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *Rail Freight I*, 292 F. Supp. 3d at 103. The natural conclusion to Defendants' failure to achieve broad coverage with rate-based fuel surcharges in this period was that they would not be able to increase revenues successfully through implementation of fuel surcharges unless all four Defendants coordinated to do so. Any railroad that attempted to aggressively apply fuel surcharges would risk losing business to competitors who did not assert fuel surcharges or otherwise made their prices more appealing to their customers.

### C.     Defendants Colluded to Increase Rates Through a Coordinated Rate-Based Fuel Surcharge Program.

32.     Beginning in the spring of 2003 and continuing at least through 2008, Defendants, through their senior executives, including their CEOs and top sales and marketing executives, began a series of communications through meetings, telephone conversations, and emails regarding the institution of a coordinated campaign to fix fuel surcharges. Defendants' top executives met and discussed their industry at AAR board meetings and biannual meetings of the National Freight Transportation Association ("NFTA").

33.     Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board. These meetings and others among Defendants' executives provided ample opportunity for collusion.

34.     In early March of 2003, CSX and UP began reviewing their fuel surcharge programs together. CSX internally proposed changes to its fuel surcharge program. UP's Chief Marketing Officer Jack Koraleski drafted a revised fuel surcharge recommendation for UP. *See*

Class Cert. Tr., 98, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6, 2010 Tr."). On March 12 and 13, 2003, Koraleski attended a meeting with CSX, and the suggested agenda noted that Koraleski and CSX EVP of Sales and Marketing Clarence Gooden discussed "fuel surcharge methodology" prior to this meeting. *Id.* at 98-99. Within one week of that meeting, CSX abandoned the program it had been contemplating and announced a plan that matched Koraleski's recommendation for UP. *Id.* at 99. On March 31, 2003, UP adopted Koraleski's program. *Id.*

35.     BNSF and NS also began discussing changes to their fuel surcharge programs around this time. During a March 18, 2003 meeting, representatives of BNSF and NS discussed "the value of synchronization across the big players in the industry." Class Cert. Tr., 349–50, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016). At NFTA meetings, executives of the Defendants met to consider and discuss developments in the railroad industry, including at the spring 2003 meeting where BNSF's and NS's Chief Marking Officers John Lanigan and Don Seale met to discuss fuel surcharge programs. Oct. 6, 2010 Tr. at 101.

36.     Likewise, on or around April 1, 2003, BNSF's Lanigan and CSX Chief Marketing Officer Michael Giftos met in Jacksonville, Florida, to discuss the "fuel surcharge" program. Oct. 6, 2010 Tr. at 101. At a May 14, 2003 meeting, NS and UP recognized that "fuel surcharges, if . . . uniformly applied across the industry[,] would be helpful." Class Cert. Tr., 350, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016).

37.     By July 2003, all Defendants had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed.

38.     Beginning in or around July 2003, the two primarily western railroads, BNSF and UP, began to effectuate the conspiracy by coordinating their fuel surcharges. Before then, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil index ("WTI Index"). In contrast, BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). In or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same fuel surcharge percentage each month through at least 2007. BNSF and UP calculated these fuel surcharges as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

39.     While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five-cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index. UP and BNSF thus moved in lockstep and charged the exact same fuel surcharge percentage for each month of the Relevant Period.

40.     BNSF and UP also coordinated *when* they would change their fuel surcharge. They agreed that the fuel surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new fuel surcharge percentage on February 1 (always on the first day of the month), and then apply

the surcharge to shipments in March. They published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

41.     BNSF's and UP's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including by using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, employing a 0.5% surcharge for every five cent increase above the trigger price, and applying the surcharge in the second calendar month after the HDF Index average price had changed. These similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

42.     Further, in April of 2003, UP had made modifications to the trigger points it used for adjusting surcharges in its program but did not change from using the WTI Index. Just two months later, UP's move to the same fuel price index used by BNSF is strong evidence of concerted conduct.

    **D.     Defendants Conspired to Institute a New Fuel Cost Index and Schemed to Fix the Fuel Surcharge Rates.**

43.     Coordination of the fuel surcharge programs only partially addressed the hurdles to imposing these new fuel surcharges on customers. As discussed above, the industry standard for private contracts still involved the use of two cost escalation indices—the RCAF and AII—that accounted for fuel costs. Defendants feared that customers would perceive application of new fuel surcharges as altering these cost escalation indices to eliminate considerations of changes in fuel costs.

44.     In the fall of 2003, UP and BNSF led an effort within the Association of American Railroads ("AAR") to encourage all Defendants to agree to eliminate fuel costs from the RCAF and AII and instead use surcharges to charge a percentage of the total cost of the shipment,

regardless of the actual cost of the fuel used in its transportation. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create, implement, and enforce coordinated fuel surcharge programs. Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board.

45.     In December 2003, Defendants announced the establishment of the unprecedented All Inclusive Index Less Fuel (the "AIILF"), which (as the name suggests) excluded fuel as a component of the index, but was otherwise similar to the AII and RCAF. The new AIILF used the fourth quarter of 2002 as its base period. The AAR explained that "This All-inclusive Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as the All Inclusive Index used with the RCAF—with the exception of the exclusion of the fuel component." Association of American Railroads, AAR Railroad Cost Indexes (March 2004).

46.     The institution of the AIILF was a departure from past practice of the AAR and a direct result of the Defendants' collective action, impossible to accomplish without the conspiracy. Defendants sought to create this new index to allow them to begin imposing stand-alone fuel surcharges, calculated as a percentage of the total cost of the freight shipment, which would thus increase Defendants' revenues beyond the mere cost of fuel. This was a carefully planned step that Defendants orchestrated together to allow for the implementation and maintenance of their price fixing conspiracy.

47.     Defendant BNSF expressly acknowledged that it worked through the AAR to achieve this result in order to allow for imposition of fuel surcharges. Responding to a question from investors regarding BNSF's contracts with coal shippers, BNSF's Chief Marketing Officer,

John Lanigan, indicated that BNSF would be able to institute fuel surcharges in these contracts as a result of the new AIILF. He gave credit for this to BNSF's Chairman, President, and CEO, Matthew K. Rose, noting that "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." BNSF's Chief Economist Sam Kyei, noted in a March 15, 2005 letter, "In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this," and that "this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact[,] the entire rail industry should benefit. . . ." *Rail Freight II*, 287 F.R.D. at 15.

48.     Following AAR's announcement of the AIILF and pursuant to the conspiracy, CSX and NS, the two primarily eastern railroads, simultaneously moved into lockstep compliance with the new fuel surcharge conspiracy. Specifically, NS's announcement of its new program in January 2004 meant that the NS and CSX would now impose a 0.4% fuel surcharge when the average price of oil rose above $23 a barrel on the WTI Index and increase rates by 0.4% for every subsequent $1 increase. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The fuel surcharge increased 2 percent for every $5 increase in the WTI average price. That made it functionally identical to the use of the HDF Index by CSX and NS, as described below.

49.     NS and CSX also coordinated the timing of fluctuations to their fuel surcharges, such that they would introduce any change to shipment costs the second month following the change in WTI index, thereby adopting precisely the same schedule that UP and BNSF had already instituted. Like the UP and BNSF, the NS and CSX published their fuel surcharge percentages on their websites such that any diversion from their price fixing plan would be readily apparent.

50.     The fact that NS and CSX were guided in their actions by agreed-upon coordination is demonstrated by their synchronized implementation of fuel surcharges that share identical unique, arbitrary, and complicated features, such as their use of the WTI Index, a trigger point at precisely $23 on the WTI Index, and application of new fuel surcharges two months following changes in the average price on the WTI Index. These similarities are too particular and too thorough to be the result of uncoordinated reactions to any common market phenomenon.

51.     There was no legitimate business justification or natural explanation for Defendants' coordinated move to cause the AAR to establish the AIILF. The existing, well-established fuel assessments set out by the AII and the RCAF already allowed Defendants to recover any increases in fuel costs through the Relevant Period and Defendant had long used these. By contrast, Defendants' fuel surcharge programs were not based on Defendants' actual fuel costs but, by charging a fuel surcharge as a percentage of the shipment cost, they were a means of increasing Defendants' revenue that was only made possible by Defendants' conspiracy to eliminate fuel costs from the RCAF.

52.     Implementation of the AIILF was a key step in Defendants' conspiracy to undermine resistance from customers who would have objected to paying twice for fuel charges, as long as Defendants enforced consistency and coordination in broad application of these new fuel surcharges.

53.     As the court overseeing the class action noted, these new fuel surcharges "were different" than the ones they had previously tried to implement unilaterally. *Rail Freight I*, 292 F. Supp. 3d at 104. Defendants' executives admitted that these new surcharges were "more aggressive" and "yielded more revenue" and was, according to one executive "a blatant general rate increase." *Id.* "A CSX executive similarly stated that although CSX's new fuel surcharge

program may seem somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.* (internal quotation marks and alterations omitted).

54.     Additionally, unlike the spotty earlier attempts to impose fuel surcharges, the new plan applied "to as many customers as possible." *Id.* For example, January 2004 BNSF pricing guidelines stated, "Every Contract should include a fuel surcharge clause. All new and all renewing contract negotiations should have a fuel surcharge as the goal." *Id.* The other Defendants had similar policies regarding the use of fuel surcharges in contracts for rail freight carriage. *Id.* Further, Defendants have admitted that these fuel surcharges were not simply about recovery of fuel costs. Indeed, prior to the introduction of the AIILF, there was already index-based cost adjustments available for that. Instead, these "new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Id.* And indeed, under these programs—and at customers' expense—Defendants saw revenue from these fuel surcharges increase exponentially. *Id.*

55.     Accordingly, Defendants' efforts to institute the AIILF were not motivated by a common problem of increasing fuel costs or a desire for more comprehensive or effective fuel cost recovery. Defendants instead were motivated by a desire for increased profits that they could achieve through broad application of a stand-alone fuel surcharge that was tied to revenue—the entire base rate for the shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment)—as opposed of actual costs. Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

56.     Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well.

57.     Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and responsibilities) participated as well. For instance, Mick McClellan, Vice President of Intermodal for NS, and Steve Branscum, Vice President of Consumer Products and head of intermodal activities at BNSF, attended the March 2003 meeting at which Defendants adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with those of the other three Defendants. Oct. 6, 2010 Tr. at 100. CSX executives Alan Blumenfeld and Les Passa, as well as UP's EVP of Network Design and Integration, Brad King, attended a June 2003 meeting in which senior executives from CSX and UP discussed the companies' fuel surcharge formulas and trigger points, as well as the customer "outcry" that stemmed from their initial attempts to apply stand-alone fuel surcharges. *Id.* at 103. In the intermodal business, UP often employed adjustable fuel surcharge provisions that they would alter to align with BNSF's fuel surcharges. CSX and BNSF executives also shared intelligence in Fall 2003, discussing percentages of intermodal business that subject to cost

escalation provisions. Upon information and belief, Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type.

58.     As a result of Defendants' conspiracy, Plaintiff and other rail shippers paid supracompetitive rates, including the inflated fuel surcharges, for rail shipment during the Relevant Period.

**E.     Defendants Imposed Supracompetitive Fuel Surcharges During the Relevant Period.**

59.     As detailed above, the Defendants agreed in 2003 to remove fuel costs from the AII and RCAF, and thereby permit the application of separate fuel surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the fuel surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

60.     Table 1, below, shows that prior to the Relevant Period, fuel surcharges varied by railroad, but BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Relevant Period:

<u>**Table 1: BNSF and UP Fuel Surcharges**</u>

| Month & Year | BNSF | UP |
|:---:|:---:|:---:|
| June 2002 | 1.0% | 0% |
| July 2002 | 1.0% | 0% |
| August 2002 | 0% | 0% |

| | | |
|---|---|---|
| September 2002 | 0% | 0% |
| October 2002 | 1.0% | 0% |
| November 2002 | 2.0% | 0% |
| December 2002 | 2.% | 0% |
| January 2003 | 2.0% | 2.0% |
| February 2003 | 2.0% | 2.0% |
| March 2003 | 2.5% | 2.0% |
| April 2003 | 4.5% | 2.0% |
| May 2003 | 2.0% | 2.0% |
| June 2003 | 3.0% | 2.0% |
| July 2003 | 2.5% | 2.5% |
| August 2003 | 2.0% | 2.0% |
| September 2003 | 2.0% | 2.0% |
| October 2003 | 2.5% | 2.5% |
| November 2003 | 2.5% | 2.5% |
| December 2003 | 2.5% | 2.5% |
| January 2004 | 2.5% | 2.5% |
| February 2004 | 2.5% | 2.5% |
| March 2004 | 3.5% | 3.5% |
| April 2004 | 3.5% | 3.5% |
| May 2004 | 4.0% | 4.0% |
| June 2004 | 4.5% | 4.5% |
| July 2004 | 5.0% | 5.0% |

| | | |
|---|---|---|
| August 2004 | 5.0% | 5.0% |
| September 2004 | 5.0% | 5.0% |
| October 2004 | 6.0% | 6.0% |
| November 2004 | 7.0% | 7.0% |
| December 2004 | 9.0% | 9.0% |
| January 2005 | 9.0% | 9.0% |
| February 2005 | 8.0% | 8.0% |
| March 2005 | 7.5% | 7.5% |
| April 2005 | 8.0% | 8.0% |
| May 2005 | 10.0% | 10.0% |
| June 2005 | 10.5% | 10.5% |
| July 2005 | 9.5% | 9.5% |
| August 2005 | 10.5% | 10.5% |
| September 2005 | 11.5% | 11.5% |
| October 2005 | 13.0% | 13.0% |
| November 2005 | 16.0% | 16.0% |
| December 2005 | 18.5% | 18.5% |
| January 2006 | 13.5% | 13.5% |
| February 2006 | 12.0% | 12.0% |
| March 2006 | 12.5% | 12.5% |
| April 2006 | 12.5% | 12.5% |
| May 2006 | 13.5% | 13.5% |
| June 2006 | 15.0% | 15.0% |

| | | |
|---|---|---|
| July 2006 | 16.5% | 16.5% |
| August 2006 | 16.5% | 16.5% |
| September 2006 | 17.0% | 17.0% |
| October 2006 | 18.0% | 18.0% |
| November 2006 | 15.5% | 15.5% |
| December 2006 | 13.0% | 13.0% |
| January 2007 | 13.0% | 13.0% |
| February 2007 | 14.0% | 14.0% |
| March 2007 | 12.5% | 12.5% |
| April 2007 | 12.5% | 12.5% |
| May 2007 | 14.5% | 14.5% |
| June 2007 | 16.0% | 16.0% |

61.     CSX and NS used the WTI Index to charge uniform fuel surcharge percentages for most of the relevant period. Table 2, below, demonstrates that the fuel surcharge percentages the Eastern Railroads charged for carload shipments varied before the Relevant Period but became identical starting in March 2004.

**Table 2: CSX and NS Fuel Surcharges**

| Month & Year | CSX | NS |
|---|---|---|
| June 2003 | 2.4% | 2.0% |
| July 2003 | 2.4% | 2.0% |
| August 2003 | 3.2% | 2.0% |
| September 2003 | 3.2% | 2.0% |

| October 2003 | 3.6% | 2.0% |
| November 2003 | 2.4% | 2.0% |
| December 2003 | 3.2% | 2.0% |
| January 2004 | 3.6% | 2.0% |
| February 2004 | 4.0% | 2.0% |
| March 2004 | 4.8% | 4.8% |
| April 2004 | 4.8% | 4.8% |
| May 2004 | 5.6% | 5.6% |
| June 2004 | 5.6% | 5.6% |
| July 2004 | 7.2% | 7.2% |
| August 2004 | 6.4% | 6.4% |
| September 2004 | 7.2% | 7.2% |
| October 2004 | 8.8% | 8.8% |
| November 2004 | 9.2% | 9.2% |
| December 2004 | 12.4% | 12.4% |
| January 2005 | 10.4% | 10.4% |
| February 2005 | 8.4% | 8.4% |
| March 2005 | 9.6% | 9.6% |
| April 2005 | 10.0% | 10.0% |
| May 2005 | 12.8% | 12.8% |
| June 2005 | 12.4% | 12.4% |
| July 2005 | 10.8% | 10.8% |
| August 2005 | 13.6% | 13.6% |

| | | |
|---|---|---|
| September 2005 | 14.4% | 14.4% |
| October 2005 | 16.8% | 16.8% |
| November 2005 | 17.2% | 17.2% |
| December 2005 | 16.0% | 16.0% |
| January 2006 | 14.4% | 14.4% |
| February 2006 | 14.8% | 14.8% |
| March 2006 | 17.2% | 17.2% |
| April 2006 | 15.6% | 15.6% |
| May 2006 | 16.0% | 16.0% |
| June 2006 | 18.8% | 18.8% |
| July 2006 | 19.2% | 19.2% |
| August 2006 | 19.2% | 19.2% |
| September 2006 | 20.8% | 20.8% |
| October 2006 | 20.4% | 20.4% |
| November 2006 | 16.4% | 16.4% |
| December 2006 | 14.4% | 14.4% |
| January 2007 | 14.8% | 14.8% |
| February 2007 | 16.0% | 16.0% |
| March 2007 | 12.8% | 12.8% |
| April 2007 | 14.8% | 14.8% |
| May 2007 | 15.2% | 15.2% |
| June 2007 | 16.4% | 16.4% |

62.     In contrast to this uniformity in fuel surcharge percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for fuel surcharges. The advance announcement of each Defendant's fuel surcharge rate was an important implementation and enforcement mechanism for the conspiracy.

63.     Railroad industry analysts took note of the curious "convergence" in fuel surcharge methodologies adopted by Defendants. For example, after concluding in 2003 that the fuel surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." John Gallagher, *Following the Competition*, TRAFFIC WORLD (July 14, 2003).

64.     Additionally, Defendants' fuel surcharges were not aligned with Defendants' actual fuel costs because, among other reasons, the surcharge rates did not account for Defendants' improvements in fuel efficiency. By calculating fuel surcharges as a percentage of the base shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

65.     There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than three years could not have happened by chance or coincidence, and it was not an expected response to a common business problem. The AII and RCAF would have accurately covered any actual increased fuel costs. Defendants' uniform pricing only could have been achieved through an express agreement followed by

24

collective action decoupling fuel prices from the historical cost indexes and agreeing to follow new, uniform programs for imposing stand-alone fuel surcharges. Defendants' purpose was to use increasing fuel costs as a pretext for implementing what were, in effect, across-the-board rate increases.

66.     Defendants' behavior in implementing their uniform fuel surcharge programs advanced their collusive interest and was inconsistent with Defendants individually pursuing their independent, unilateral self-interest. In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads. Similarly, if a competitor increased their surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor. Defendants did not engage in such competitive behavior and instead adhered to a collusive, industrywide pattern of uniform fuel surcharge pricing based on the total base rate of the shipment.

**F.     Defendants Took Additional Steps to Ensure Industry-Wide Application of Inflated Fuel Surcharges.**

67.     While Defendants' coordinated, aggressive fuel surcharges would significantly increase their revenue, they recognized that the success of the cartel was potentially vulnerable to Defendants reacting to customer resistance by competing instead of adhering to the fuel surcharge conspiracy. Defendants took steps to ensure a successful and profitable conspiracy.

68.     First, Defendants began publishing their Rail Fuel Surcharges publicly on their websites to facilitate monitoring of each participant's loyalty to the collusive arrangement.

69.      Second, Defendants often switched from offering long-term contracts to offering contracts that were regularly "re-priced" to ensure that the new collusive fuel surcharges were

applied to all customers. Prior to the conspiracy, long term contracts were the norm. This switch allowed Defendants to detect, deter, and if necessary, punish any cheating among the cartelists.

70.     Defendants made this switch away from long-term contracts even though shippers generally preferred the former system to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume these greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should in turn promote competition among carriers for their business. Instead, each of the Defendants raised their prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Defendants collectively refused to offer long-term contracts and took no steps (other than their mutual conspiracy) to minimize their own risks from fluctuations in demand. This coordinated behavior was not routine market conduct.

71.     Third, Defendants took steps to force these changes on customers across the marketplace because they knew that any break in ranks would undermine the conspiracy. An internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers." *Rail Freight I*, 292 F. Supp. 3d at 104. And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail." Class Cert. Tr. at 61.

72.     Accordingly, Defendants sought to effectively force these aggressive fuel surcharges on customers across the board by adopting policies to apply fuel surcharges to 100% of their shipments and tracking progress in achieving that goal.

73.     BNSF's marketing executives began tracking fuel surcharge "adherence" on a quarterly basis in 2004 through adherence reports that tracked fuel surcharge revenue, the number of newly-issued price authorities including fuel surcharges, and significant opportunities (i.e. customers whose contracts were expiring and did not already provide for fuel surcharges). Oct 6, 2010 Tr. at 123. BNSF sought to obtain 100% coverage of fuel surcharges across its customers and presented the adherence reports to the chief marketing officer to assess progress towards this goal. *Id.*; *see also Rail Freight I*, 292 F. Supp. 3d at 106-07.

74.     CSX also set its sights on ensuring that "[e]verything is subject to fuel surcharge" and tracked its effectiveness in enforcing fuel surcharges with its customers. CSX monitored both its individual marketing teams' activities and potential opportunities in the form of contracts without fuel surcharges that were up for renewal. *Rail Freight I*, 292 F.Supp.3d at 107.

75.     UP established a similar monitoring program in early 2004, which included presentation of analysis of UP's fuel surcharge coverage to the chief marketing officer, who made sure his teams looked for ways to expand fuel surcharge coverage. NS likewise tracked its fuel surcharge coverage and monitored significant opportunities for imposing the fuel surcharges. Defendants also ensured one another's compliance with the price fixing conspiracy by sharing data regarding their respective fuel surcharge coverage. For example, BNSF sent NS's Don Seale a report in advance of a meeting between the Defendants in late 2004, which surveyed "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

76.     A key part of Defendants' conspiracy involved Defendants' establishment of strict policies against granting individualized exceptions to the announced fuel surcharges or allowing for discounts on the fuel surcharges or overall contract rates.  This marked a change of course from Defendants' prior conduct, in which they habitually entertained such negotiations.  Defendants instead gave numerous shippers, across a variety of industries, the uniform message that fuel surcharge percentages were "not negotiable." For example, in December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of a fuel surcharge with UP. *Rail Freight I*, 292 F. Supp. 3d. at 100. A year later, after the conspiracy had begun, U.S. Magnesium was unable to do so because UP refused—U.S. Magnesium was informed that "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Id.*

77.     Defendants also established policies against discounting the base shipping rates in order to offset the impact of fuel surcharges. For instance, NS's Don Seale instructed against this in an internal email, stating: "I want to underscore that we should not be foregoing base rate increases in return for [fuel surcharge] application.  That is a shell game that all product managers should not play." Oct. 6, 2010 Tr. at 113.

78.     Consequently, any negotiations that Defendants did engage in with their customers had a starting point of the standard, artificially high fuel surcharge.

79.     NS's Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Id.* at 104. CSX noted in its 10-K filing for the 2005 fiscal year that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms." CSX Corp. 10-K at 15 (Feb. 24, 2006). BNSF's Chief Economist Sam Kyei emailed BNSF's Chief

Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Rail Freight I*, 292 F. Supp. 3d. at 104. This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the co-conspirators easier.

80.     Defendants imposed their fuel surcharges without variation between different kinds of traffic and commodities. For example, NS advised UP in October 2005 that "We only have one fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it." Class Cert. Tr. at 64.

81.     Defendants also uniformly enforced the fuel surcharges regardless of whether a customer could make use of alternative modes of transportation. NS's chairman Moorman acknowledged, in testimony to Congress, that customers that did not have access to alternative modes of transportation—so-called "captive" shippers—could use other sources of leverage to bargain for a better rate package on traffic at facilities that were served by only one railroad.  He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.[1]

---

[1] Senate Hearing 110-886 Before the Subcomm. on Surface Transp. and Merchant Marine Infrastructure, Safety, and Security, S. Comm. on Commerce, Science, and Transp., 110 Cong. (2007) (statement of Charles W. Moorman, Ass'n of Am. R.R.s).

82.     Once Defendants resolved to uniformly enforce their fuel surcharge programs, captive shippers were no longer able to negotiate out of the fuel surcharges.

83.     Fourth, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad. Where a shipment required movement on more than one railroad, Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

84.     Fifth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or "steal" market share by using their increased revenues to subsidize discounting of their underlying rates. Defendants' market shares remained stable following the 2003 agreements.

**G.     Defendants' Fuel Surcharge Program Drew Scrutiny and Condemnation.**

85.     Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the

actual increase in fuel costs for handling the particularly [sic] traffic to which the surcharge is applied." *Id.* at 6.

86.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

87.     Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

88.     In addition to the Surface Transportation Board, each Defendant has been the target of a state grand jury subpoena and/or state grand jury inquiry concerning their Rail Fuel Surcharges, as Defendants admitted in their 2008 SEC Form 10-Ks. CSX stated in its 10-K filing that "In July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." CSX Corp., 10-K, at 99 (February 22, 2008). BNSF stated in its 10-K filing that "The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." BNSF Railway Company, 10-K, at 10 (February 15, 2008). NS stated in its 10-K filing that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." Norfolk Southern, 10-K, at K16 (February 15, 2008). UP stated in its 10-K filing that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional

meetings in the future in an effort to resolve that office's interest in this matter." Union Pacific Corp., 10-K, at 15 (February 28, 2008).

89.    Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on fuel surcharges, Defendants realized billions of dollars in revenues in excess of their actual fuel costs. In August 2005, UP's executive Mark J. Draper emailed that UP's senior finance management held the position that the proposed fuel surcharge was "not some 'trying to make whole' value," and other UP employees saw "nothing wrong with recovering at a rate greater than 100%." *Rail Freight I*, 292 F. Supp. 3d at 114 (quoting E–mail from Mark J. Draper to Mary E. McArdle (Aug. 2, 2005)). In June 2004, CSX's then-Commercial Finance Director Erik Palm emailed that "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge trigger point." *Id.* (quoting E-mail from Erik Palm (June 3, 2004)).

90.    A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade." The Current Financial State of the Class I Freight Rail Industry, Comm. On Commerce, Science, and Transp. 4 (Sept. 15, 2010).

91.    The Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume." NS Annual Report 2006, at K20.

92.    BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." BNSF Railway

Co., 10-K , at 18 (Feb. 16, 2007). "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005." *Id.* at 21.

93.     In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges." Union Pacific Corporation, 2006 Annual Report, at 17.

94.     In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." CSX Corp., 2006 Annual Report, at 25.

95.     Private third-party research also disclosed the existence and scale of the scheme. A 2007 independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that during the period from 2003 through the first quarter of 2007 Defendant's Rail Fuel Surcharge revenue (as publicly reported or estimated) exceeded Defendants' publicly reported actual fuel costs by over $6 billion. Snavely King Majoros O'Connor & Lee, Inc., Analysis of Rail Fuel Surcharges During the Period 2003-2007: A Report to the Am. Chemistry Council (July 25, 2007).

96.     Because of Defendants' unlawful conduct, the fuel surcharges Defendants charged Plaintiff for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels. Defendants' conspiracy deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation. These effects began in early 2003 and persisted through at least 2008.

97.     Plaintiff sustained injury to its business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act. Plaintiff entered into contracts with one or more of Defendants and was thereby injured by paying supracompetitive prices applied to unregulated rail freight transportation throughout the U.S. as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade. The federal laws were designed to punish and prevent the type of antitrust injury that Plaintiff suffered here.

## VI.     COUNT, PRAYER FOR RELIEF, AND JURY DEMAND

### Count I

**(Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)**

98.     Plaintiff incorporates the allegations in the paragraphs above.

99.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

100.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

101.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of and substantially affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

102.    Defendants' contract, combination, or conspiracy has had at least the following effects:

    a.    Prices Defendants charged Plaintiff for fuel surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

    b.    Defendants' conduct deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

    c.    Defendants' conduct unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid for, customers of, and territories for rail freight transportation services.

103.    As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it paid supracompetitive prices for unregulated rail freight transportation services.

**Prayer for Relief**

Plaintiff prays for relief as follows:

(1)    That this Court adjudicate and decree that the unlawful contract, combination, and conspiracy alleged in Count I was an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act,

(2)    That Plaintiff recovers compensatory damages, as provided by law, and that this Court enter judgment against Defendants on behalf of Plaintiff,

(3)    That this Court permanently enjoin and restrain each Defendant's respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert

with them from continuing or maintaining the combination, conspiracy, or agreement alleged in this case,

       (4)     That Plaintiff recovers treble damages, as provided by law,

       (5)     That Plaintiff recovers its costs of the suit, including attorneys' fees, as provided by law, and

       (6)     That Plaintiff recovers such other and further relief as the Court may deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: September 15, 2020             By:

                               */s/ Daniel J. Walker*

Daniel J. Walker (Bar # 219439)
Berger Montague PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
(202) 559-9745
dwalker@bm.net

Michael C. Dell'Angelo (Bar # PA0090)
Michael J. Kane
H. Laddie Montague, Jr.
Michaela Wallin
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

*Counsel for Plaintiff ABF Freight System Inc.*